# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **MAUREEN MURPHY** <br> 2240 Maplewood Rd. <br> Cleveland Hts. 44118 <br><br> Plaintiff, <br> vs. <br><br> **THE MONTEFIORE HOME, INC.** <br> 1 David Myers Parkway <br> Beachwood, Ohio 44122-0000 <br><br> and <br><br> **MONTEFIORE HOME** <br> 1 David Myers Parkway <br> Beachwood, Ohio 44122-0000 <br><br> and <br><br> **VINNEY HOSPICE AND PALLIATIVE CARE OF MONTEFIORE** <br> 1 David Myers Parkway <br> Beachwood, Ohio 44122-0000 <br><br> and <br><br> **MONTEFIORE FOUNDATION** <br> 1 David Myers Parkway <br> Beachwood, Ohio 44122-0000 <br><br> Defendants. | CASE NO. 1:14-CV-172 <br><br> JUDGE <br><br> **COMPLAINT** <br><br> (Jury Demand Endorsed Hereon) |

Plaintiff Maureen Murphy (hereafter "Murphy"), for her Complaint against Defendants The Montefiore Home, Inc., Montefiore Home, Vinney Hospice and Palliative Care of Montefiore, and Montefiore Foundation (collectively referred to herein as "Montefiore"), alleges as follows:

**PARTIES**

1. At all times relevant to this lawsuit, Murphy was a United States citizen and resident of the State of Ohio.

2. At all times relevant to this lawsuit, Murphy was an "eligible employee" within the meaning of the Family and Medical Leave Act ("FMLA"), 29 U.S.C § 2601, *et seq.* and an "employee" within the meaning of Ohio Revised Code Section 4113.52 and The False Claims Act (FCA), 31 U.S.C. §§ 3729 - 3733.

3. Montefiore is an "employer" within the meaning of the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq*. and Ohio Revised Code Section 4113.52.

4. At all times relevant to this lawsuit, Montefiore was Murphy's "employer" within the meaning of the FMLA and Ohio Revised Code Section 4113.52.

5. At all times relevant to this lawsuit, Defendants were "integrated employers" or "joint employers" under the FMLA with respect to Murphy's employment.

**JURISDICTION AND VENUE**

6. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because one or more of the claims involved arise under the laws of the United States.

7. The Court has supplemental jurisdiction over Murphy's state law claim pursuant to 28 U.S.C. § 1367.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events giving rise to this lawsuit occurred in this District.

## FACTUAL ALLEGATIONS

## FMLA

9. From approximately August 2010 through February 8, 2013, Murphy was employed by Montefiore as a hospice nurse.

10. While employed as a hospice nurse at Montefiore, Murphy was qualified for her position and performed her nursing duties to her employers' legitimate expectations.

11. Beginning in March 2012, Murphy exercised her rights under the Family and Medical Leave Act to take a leave of absence from work due to her own serious medical condition.

12. While Murphy was on her protected medical leave, one or more of her supervisors at Montefiore openly discussed replacing her.

13. Murphy's supervisors at Montefiore made known their displeasure with Murphy because she exercised her protected rights under the FMLA.

14. After Murphy returned from her protected medial leave, she learned that the terms and conditions of her employment had changed. For example, she was no longer provided an assigned work space in the documentation room or any other enclosed office, but was instead told to work on a computer in an open hallway.

15. After Murphy returned from her protected medical leave, one of her supervisors, Peggy Severini, repeatedly made comments to Murphy indicating her displeasure with Murphy because she had been on a protected medical leave. For example, Severini stated that another nurse "did a great job while" Murphy was on leave, and cautioned Murphy to "be careful" because that nurse would "love to have" her job. Murphy was told that the other nurse had "saved (Montefiore's) -ss" while she was out on medical leave.

16. Murphy voiced her objection to Severini's comments to one of her supervisors, the Montefiore Clinical Coordinator, Cindy Cohen.

17. Montefiore failed to take any action to ensure that Severini complied with the Family and Medical Leave Act, or to ensure that Murphy was protected from retaliation.

18. Severini continued to make remarks to Murphy disparaging her because she exercised her rights under the FMLA.

19. In July 2012, Murphy complained to the Director of Hospice Care, Diane Korman, that she felt that Severini was treating her less favorably because she exercised her rights under the FMLA. Again, Montefiore failed to take any action to ensure that Severini complied with the Family and Medical Leave Act, or to ensure that Murphy was protected from retaliation.

20. After Murphy complained to the Director of Hospice Care, Montefiore reduced Murphy's hours, and therefore her wages, significantly.

21. Murphy was told her hours and wages were cut due to "budget reasons."

22. At or about the same time Murphy's hours and wages were reduced, the hours and wages of the nurse who filled in for her during her FMLA protected medical leave were increased.

**FALSE CLAIMS/WHISTLEBLOWER**

23. Beginning in late October or early November, 2012, Cindy Cohen, Montefiore's Clinical Coordinator, instructed Montefiore hospice nurses to create and otherwise alter medical records for the purpose of obtaining medicare and/or medicaid payments from the federal government.

24. On or about November 12, 2012, Cohen gave Murphy a manila envelope with written instructions to create and/or alter more than eighty medical records from the prior year for the purpose of obtaining or retaining medicare and/or medicaid payments.

25. Cohen told Murphy that she had also given a similar envelope to each of the hospice nurses and social workers.

26. As soon as she reviewed the contents of the envelope, on or about November 12, 2012, Murphy objected to Cohen's instructions, advising both Cohen and Diane Korman, the Director of the Montefiore hospice facility, that by following the instructions she would be committing fraud and placing her nursing license at risk.

27. Montefiore took no action at that time to instruct any of the nurses or social workers not to follow Cohen's instructions regarding the creation and alteration of medical records.

28. Cohen instructed at least nine Montefiore nurses, in addition to Murphy, to create or otherwise alter medical records for the purpose of obtaining medicare payments from the federal government.

29. Each nurse, and presumably each social worker, was provided a list of patient names and dates, and they were instructed to create or alter these patients' medical records to reflect visits on the dates listed.

30. Cohen instructed these employees not to write "late entry" in the newly created or altered medical record, or to otherwise indicate that it had been recently created or altered, and not to use the computer to alter the records.

31. Cohen instructed the employees that if they did not recall details of a specific visit enough to create a record of the visit, they should tell her and she could delete the reference to the patient visit from the chart altogether.

32. Cohen so instructed these employees for the purpose of defrauding or otherwise misleading the government regarding when the medical record had been created.

33. Cohen so instructed the nurses so that Montefiore could obtain and/or retain medicare payments to which it would not otherwise be entitled.

34. Several of the nurses complained to Murphy that they were instructed to create so many patient visits that the task was very time consuming.

35. On or about November 19, 2012, Murphy asked Cohen how she created the list of visits she provided to Murphy, as the calendar showed that Murphy had not visited the patients listed on the dates listed. Cohen typed something into the computer system, then told Murphy to refresh her screen. When Murphy did so, the calendar had been altered to show patient visits on the days listed.

36. Immediately thereafter, Murphy reported Cohen's conduct to Montefiore Human Resources Department, including Carole Weiss, Director of Human Resources. Murphy showed Weiss the envelope and contents given to her by Cohen, and told her she believed that Cohen was instructing her and the other employees to break the law and commit fraud.

37. Weiss instructed Murphy to speak with the Administrator, Mark Weiss. That same day, November 19, 2012, Murphy met with Mark Weiss and the Montefiore Director of Nursing, Gina Prosser.

38. After Murphy explained Cohen's instructions to the nurses and her concerns about those instructions, Prosser told Mark Weiss, "we have a problem."

39. Weiss thanked Murphy, had his secretary copy the packet, and told Murphy they would conduct an investigation.

40. Throughout this time period, nurses and social workers continued to create and alter medical records as Cohen had instructed them.

41. Sometime in the next few days, Korman circulated a voicemail to the nursing staff instructing them not to follow Cohen's earlier instructions.

42. On or about November 28, 2012, Montefiore held a mandatory "in-service," educating the nursing staff regarding late documentation protocol.

43. At the meeting on or about November 28, 2012, Cohen admitted to those present that she had frequently altered nursing notes without the knowledge of the nurse who had visited the patient.

44. The next day, Murphy complained, in writing, to Montefiore, that Cohen and/or others at Montefiore had engaged in illegal misconduct by creating and altering medical records and expressed concern that the records could continue to be altered.

45. On or about November 29, 2012, Montefiore and Cohen announced that Cohen had resigned her position.

## **RETALIATION**

46. After Cohen resigned, Murphy was treated with hostility by some of her coworkers at Montefiore.

47. On or about December 2, 2012, Murphy was singled out to be excluded from a mandatory staff meeting. When she asked Korman about the reason for it, Korman told Murphy she would not have "wanted to be there." Murphy explained that she felt Korman was promoting ill will towards Murphy, and Korman responded simply, "Maureen, just drop it."

48. Later that same day, Murphy was reprimanded by Korman and Weiss because another nurse had allegedly complained that Murphy had used an "an abrasive tone." Murphy was told she should apologize to the other nurse; other nurses who had been hostile towards Murphy were not instructed to apologize to her.

49. On or about December 13, 2012, Murphy received her pay stub and realized that she had not been paid for sixty-two hours she had worked that pay period. She reported the shortage to Korman early in the morning, noting that she was concerned it would cause checks she issued on "autopayment" to be returned for insufficient funds. Although Korman responded that she would ensure the matter was corrected as soon as the payroll employees arrived that morning, Murphy heard nothing back from Korman or Montefiore that morning.

50. By afternoon, hearing nothing from Montefiore and concerned about overdrafts on her account, Murphy sent an email to Korman expressing her concerns. Sometime later, Korman telephoned Murphy and instructed her to pick up her check in Mark Weiss's office.

51. Murphy went to Mark Weiss's office, and Carol Weiss from HR was there as well. Murphy expressed to them that she felt the pay shortage was retaliation for her complaint about the illegal creation and/or alteration of medical records. Carol Weiss responded that Maureen obviously "doesn't trust Montefiore" and asked why she wanted to continue to work there. Murphy told them that she "loved her job" at Montefiore.

52. On or about December 20, 2012, Murphy was on scheduled paid time off, and received a telephone call from Montefiore instructing her to come in to meet with Human

Resources. She complied, and once again she was reprimanded about the same alleged complaint she had already been reprimanded about on or about December 2, 2012.

53. On or about December 26, 2013, Murphy made a written complaint to Montefiore indicating that she felt she was being retaliated against because she complained about Cohen's instructions to the nursing staff to engage in illegal medical record alteration.

54. Four days later, on or about December 30, 2013, Murphy made a written complaint to Montefiore that one of the electronic medical record programs used by Montefiore permitted anyone with access to the system to create, alter or delete a medical record for another nurse.

55. On or about February 4, 2013, Murphy was, yet again, called into Human Resources to discuss the alleged complaint she was reprimanded about on or about December 2, 2012.

56. On or about February 6, 2013, Murphy made a written complaint to Montefiore indicating that she felt she was being retaliated against because she complained about Cohen's instruction to the nursing staff to engage in illegal medical record alteration.

57. Two days later, Murphy was terminated from her employment by Montefiore.

58. Montefiore's stated reason for terminating Murphy, that she "has become unwilling or unable to work constructively with the Montefiore and Hospice management team," is mere pretext.

### FIRST CLAIM FOR RELIEF — FMLA

59. Murphy realleges each and every allegation set forth above as if fully rewritten.

60. Murphy was entitled to FMLA leave at the time of her request.

61. Murphy's request for, and use of, leave was protected activity under the FMLA.

62. Murphy's complaints to Cohen and Korman, that Severini was treating her less favorably because she exercised her rights under the FMLA, was protected activity under the FMLA.

63. Defendants knew of Murphy's protected activity.

64. Defendants discriminated and/or retaliated against Murphy because she exercised her rights under the FMLA, and/or because she opposed or complained about an unlawful practice under the FMLA, by harassing her, reducing her hours and wages, and ultimately terminating her employment, all of which constitute adverse employment actions.

65. There is a causal connection between Murphy's protected activity and the adverse actions.

66. Murphy's protected activity under the FMLA was a motivating factor in Defendants' decision to fire her.

67. Defendants have therefore unlawfully retaliated against Murphy due to her exercise of her rights under the Family and Medical Leave Act.

68. As a result of her firing, Murphy: lost income, wages, and benefits; incurred costs and expenses, such as attorneys' fees and costs of suit; and, was otherwise injured.

69. Defendants' actions were willful and/or in reckless disregard of Murphy's protected rights.

**SECOND CLAIM FOR RELIEF – WHISTLEBLOWER**

70. Murphy realleges each and every allegation set forth above as if fully rewritten.

71. This claim was previously and timely commenced in the Court of Common Pleas for Cuyahoga County Ohio, within 180 days of the date Murphy was terminated, and was subsequently dismissed, without prejudice, less than one year prior to the date of the

filing of this Complaint. Accordingly, this action is timely pursuant to Ohio Revised Code § 2305.19, commonly known as the Ohio Savings Statute.

72. In the course of her employment with Defendants, Murphy became aware of conduct by the Defendants, through their agents, servants and employees, and/or by Murphy's fellow employees, which conduct Murphy reasonably believed constituted felonious fraud. Plaintiff notified Defendant, first orally and then, more than twenty-four hours later, in writing, of said conduct.

73. In retaliation for Murphy's conduct, as described above, Defendants, through its agents, servants and/or supervisory employees, took disciplinary action against Murphy and ultimately wrongfully terminated her, without just cause, in violation of Ohio Revised Code Section 4113.52.

74. As a direct and proximate result of Defendant's unlawful, tortious and wrongful conduct, as described above, Plaintiff suffered emotional distress, lost salary, wages, and benefits, incurred costs of litigation, attorney fees, and other damages, which damages and loss will continue to accrue indefinitely into the future.

**THIRD CLAIM FOR RELIEF - FALSE CLAIMS ACT RETALIATION**

75. Plaintiff, for her Third Claim for Relief, realleges each and every allegation set forth in her First and Second Claims for Relief as if fully rewritten herein, and further states that the creation or alteration of medical records to obtain medicare payments, without accurately recording the date of the entry in the medical record, is conduct in violation of the False Claims Act.

76. Defendants retaliated against Murphy and ultimately wrongfully terminated her, without

just cause, because she objected to Defendants' employees' conduct in violation of the False Claims Act and/or otherwise made efforts to stop Defendants from continuing to violate the False Claims Act.

**WHEREFORE,** Murphy prays for judgment against Defendants: for back pay, front pay, lost benefits, emotional distress and other compensatory damages in amounts that will fully and fairly compensate her for her injury, damage, and loss; for an award of statutory and/or liquidated damages; for reinstatement and other equitable relief; for attorneys' fees and costs of suit;  and, for such other relief as the Court deems just.

## JURY DEMAND

A trial by jury is hereby demanded in the within matter in the maximum number of jurors allowed by law.

Respectfully submitted,

*/s/ Cathleen Bolek*
CATHLEEN M. BOLEK (0059884)
MATTHEW D. BESSER (0078071)
**BOLEK BESSER GLESIUS, LLC**
Monarch Centre, Suite 302
5885 Landerbrook Drive
Cleveland, Ohio 44124
T 216.464.3004
F 866.542.0743
cbolek@bolekbesser.com
mbesser@bolekbesser.com

*Counsel for Plaintiff*